UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| AMY SANDERS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| -v- | ) | No. 1:11-cv-926 |
| | ) | |
| LIBERTY LIFE ASSURANCE COMPANY OF | ) | HONORABLE PAUL L. MALONEY |
| BOSTON, | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION AND GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

This case involves a claim for benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* Before this court are cross-motions for judgment on the administrative record (ECF Nos. 21 and 25), filed pursuant to *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998).

**I.    BACKGROUND**

**A.    Medical History and Initial Claim**

In fall 2008, Plaintiff Amy Sanders was working as a Customer Service Representative at Advance America Cash Advance. According to the company's description of this position, her duties included "assisting customers in obtaining advances, servicing existing accounts with great customer service, marketing and collections." (LL-0445.) The job also involved some local travel and accordingly required a "[v]alid drivers license, reliable transportation, [and] immediate access to a vehicle during working hours." (LL-0446.)

As a Cash Advance employee, Ms. Sanders was covered by a disability insurance policy that the company had bought from Liberty Life Assurance Company of Boston. (LL-0001–52.) This policy provided for short-term disability and two stages of long-term disability. Short-term

disability provided 24 weeks of benefits to one who became "unable to perform the Material and Substantial Duties of [her] Own Job." (LL-0008.) The first stage of long-term disability provided 24 months of benefits to one who met that same standard (*id.*); after those 24 months, the claimant would only continue to receive benefits if she was "unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation." (*Id.*)

On September 3, 2008, Ms. Sanders stopped working and filed for disability. She claimed that since that spring, she had been suffering from occasional "spells" of shifted vision and dizziness. Later that month, Ms. Sanders described these spells to her neurosurgeon as follows:

> She tells me that she started to note symptoms about five or six months now. She has noted that she had episodes that felt like her vision was shifting. It has happened three or four times in the last five or six months. . . . She has this feeling of 'dread feeling' like something is going to happen and about a few minutes later her vision will shift. When I asked her about this, [she said] it just feels like her vision will shift . . . after which she feels 'off balance.' She cannot stand, she has to hold onto something, she does not completely lose consciousness, she is awake all the time, but she is totally out of balance and if she does not hold onto something it feels like she is going to fall and it feels like the inside of her head is moving, not really spinning, but moving inside. The whole episode will last for about anywhere from 10 to 25 minutes before it settles down.
>
> * * *
>
> There is no trigger factor that she can think of. No pattern to it, it can happen anytime [sic] of the day, but usually noted it during the afternoon time.

(LL-0133–34.) Primarily because of these spells, Ms. Sanders's primary care physician, Dr. Charles Barker, declared her to be "off work total" for an "unknown" time, though he listed her prognosis as "good." (LL-0496.) Dr. Barker also filled out a Restrictions Form provided by Liberty. (LL-0495.) On that form, he indicated no physical limitations and described Ms. Sanders's mental

2

limitations as "Visual changes, double vision, numbness in extremities, confusion, and fatigue." (*Id.*)  He listed the medical findings supporting these limitations as "Closed head injury in past, numbness, weakness, memory loss, visual changes, dizziness."  (*Id.*)

Ms. Sanders's doctors did not know just what was causing her spells.  Approximately 25 years prior, she had received a serious head injury in a car accident and spent two weeks in a coma. She had taken an anti-seizure medication for several months afterward, though it was not clear from her records whether this was prophylactic or not.  Further, an MRI done in mid-September 2008 revealed an arachnoid cyst—a "fluid-filled sac[] on the arachnoid membrane that covers the brain."[1] (LL-0503.)  Regardless of the cause, the medications that Ms. Sanders was taking appeared to help somewhat, according to her neurologist, Dr. Evelyn Navarro.  (*See* LL-0134.)  Ultimately, though, Dr. Navarro recommended little more than continuing the medication and referring Ms. Sanders to a neurosurgeon "for input regarding the arachnoid cyst."  (LL-0138.)

Ms. Sanders saw one neurosurgeon, Dr. Jurgen Luders, on October 1.  Dr. Luders in turn referred Ms. Sanders to Dr. Adrianna Tanner for further evaluation, "to try to help determine if [her spells were] in fact seizure activity."  (LL-0309–11.)  After their first evaluation, Dr. Tanner noted that while Ms. Sanders does have "two major risk factors for developing focal epilepsy," her spells seemed "somewhat atypical" for epilepsy.  (LL-0307.)  She recommended a follow-up appointment for EEG monitoring to determine whether Ms. Sanders actually had epilepsy or not.  In the meantime, Dr. Tanner noted, "because it is unclear whether or not she loses awareness during the seizures that I would recommend that she does not drive."  (LL-0307.)  In late October 2008, Dr.

---

[1] WebMD, Arachnoid Cysts,  *available at*
http://www.webmd.com/cancer/brain-cancer/arachnoid-cysts (last visited Aug. 20, 2013).

3

Tanner was able to record several of Ms. Sanders's spells during the EEG monitoring.  (LL-0301.)

None of them, however, showed any EEG changes.  This, Dr. Tanner concluded, "suggests that

these spells are nonepileptic in nature."  (*Id.*)  After Drs. Tanner and Luders discussed these results,

they concluded that brain surgery was unlikely to help Ms. Sanders, as her events were probably not

epileptic and probably not related to her arachnoid cyst.  (LL-0300.)

On December 4, 2008, Ms. Sanders saw Dr. Barker again.  He reported that though her visual

distortions were "persistent," her vertigo was "stable."  (LL-0277.)  She "denies the sensation of

moving around in space," and "[t]here are no complaints of having difficulty maintaining

equilibrium."  (LL-0277.)  Dr. Barker again filled out Liberty's Restrictions Form.  As before, he

indicated no physical limitations and described Ms. Sanders's mental limitations as "Visual changes,

double vision, numbness in extremities, confusion, and fatigue."  (LL-0281.)

### B.      Denial of Short-Term Disability, Appeal, and Reversal

Initially, Liberty approved Ms. Sanders's short-term disability claim and extended benefits

through December 4, 2008.  (*See* LL-0074–78.)  After her neurosurgery consultation, however,

Liberty commissioned a nurse to review Ms. Sanders's file.  The nurse concluded that the medical

evidence did not support any finding of ongoing disability.  (LL-0072–73.)  Liberty agreed and

denied Ms. Sanders's short-term disability claim going forward.  (LL-0071–72; LL-0272.)  Ms.

Sanders appealed.  (LL-0629.)

During this time, Ms. Sanders's treatment continued.  In spring 2009, Dr. Barker referred

her to Dr. Harold Hollander, of Comprehensive Ear, Nose and Throat, P.C.  Ms. Sanders first saw

Dr. Hollander on March 5, 2009, when she described to him her current state:  "The patient states

she has a history of balance disturbance since the summer of 2008.  These episodes are spontaneous,

occurring 1-2 times a week, with visual disturbance and a shifting in direction to the right. This will last for approximately one minute and then diminish." (LL-0149.) Over the course of three visits in the spring of 2009, Dr. Hollander ran several types of tests, but concluded only that many factors could be contributing to her spells. Aside from her cyst and the medications she was taking, all of which were "known to cause balance disturbance," Dr. Hollander found that Ms. Sanders suffered from "[s]evere asymmetrical hearing loss" (LL-0150) and possibly also Meniere's disease (LL-0147). In May 2009, Dr. Hollander concluded that "vestibular rehabilitation will be her only possible treatment at this time." (*Id.*)

On July 7, Dr. Barker saw Ms. Sanders again. She reported to him that she felt "real shaky," and that she was feeling that way more and more often lately. (LL-0155.) Shortly thereafter, Dr. Barker filled out a form opining on Ms. Sanders's ability to do work-related mental activities. (LL-0238–29.) He opined that Ms. Sanders could perform none of the 25 listed abilities at an "Unlimited or Very Good" level, and only one of them ("Adhere to basic standards of neatness and cleanliness") at the "Limited but satisfactory" level. (*Id.*) Seven abilities fell within the "Seriously limited, but not precluded" level, but the vast majority were deemed "Unable to meet competitive standards," including:

- Remember work-like procedures

- Maintain regular attendance and be punctual within customary, usually strict tolerances

- Sustain an ordinary routine without special supervision

- Work in coordination with or proximity to others without being unduly distracted

- Make simple work-related decisions

5

- Perform at a consistent pace without an unreasonable number and length of rest periods

- Accept instructions and respond appropriately to criticism from supervisors

- Get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes

- Respond appropriately to changes in a routine work setting

- Travel in unfamiliar place

(*Id.*)  To explain these limitations, Dr. Barker stated only that Ms. Sanders suffered from a "Closed head injury[,] ADD[,] Headache[; and] memory issues" and was "emotionally labile."  (*Id.*)  He estimated that her impairments would cause her to be absent from work for approximately two days per month.  (*Id.*)

Ms. Sanders saw Dr. Barker in August and September as well, reporting to him that her symptoms increased while riding in a car.  (LL-0157–60.)

That summer and fall, Liberty commissioned another nurse review and an independent doctor's review of Ms. Sanders's medical records.  (*See* LL-0067–69, LL-0235.)  The nurse again concluded that the evidence in the file did not support any particular restrictions or limitations.  (*See* LL-0069.)  "There is no documentation in the file to support any cognitive impairment; there is no cognitive testing or even a mental status exam to support impaired memory or focus. . . . There is no objective medical evidence to support the [claimant's] self-reported symptoms," she concluded.  (*Id.* (original text in all-capitals).)

The other reviewer, Dr. Faizan Hafeez, appeared to disagree.  (*See* LL-0235, LL-0398–407.)  Dr. Hafeez did not question the existence of Ms. Sanders's spells, despite the fact that a definitive cause had not been found.  He opined that Ms. Sanders "may have mild cognitive impairment,"

though her medical records "failed to reveal any objective findings of dysmentia." (LL-0402.) Further, Dr. Hafeez concluded, "Restrictions and limitations are supported by the medical evidence in the file." (LL-0402.)  Dr Hafeez discussed these restrictions and limitations no further, however, and when asked to explain, he admitted that "without any further information [or] without examining the patient, I cannot provide any more clarifications":

> For specific restrictions patient can be assessed by physical and rehabilitation medicine expert.
>
> For cognitive impairments a neuropsychological evaluation can be performed.
>
> Based on the information provided to me is not enough [sic] to give any further clarifications on her physical or cognitive restrictions.

(LL-0404.)

Based on Dr. Hafeez's review, on October 29, 2009, Liberty retroactively reinstated Ms. Sanders's short-term disability benefits for the full six-month term, through March 3, 2009.  (LL-0232.)

### C.    Denial of Long-Term Disability

In November 2009, Ms. Sanders reported to Dr. Barker that her visual distortions were "stable" and that she was suffering from "less frequent episodes." (LL-0161.)  On the other hand, Dr. Barker noted that her vertigo "has not changed with frequent episodes since the last visit.  The patient has the sensation of moving around in space." (*Id.*)  Around the same time, Ms. Sanders filled out an Activities Questionnaire provided by Liberty. (LL-0203–07.)  In it, she stated that she was able to sit or stand for only 5–10 minutes, that she was able to walk for 15–20 minutes, and that she was able to sit in a car for 10–15 minutes. (LL-0203.)  Nonetheless, Ms. Sanders stated that she was able to perform almost all of the activities of daily life without assistance, including cooking,

cleaning, doing laundry, answering mail, and managing her finances. (LL-0206.) Ms. Sanders

explained that the following problems kept her from being able to work:

> no driving and not being able to keep attention to work [and no]
> memory of what I am doing and having episodes of shifting vision
> and dizziness, light-headedness, remembering what I am doing at the
> time I am doing it, confusion doing more than one thing at a time.

(LL-0207.)

In December, Ms. Sanders's vertigo improved, "with only an occasional episode since the

last visit." (LL-0163.) Near the end of the month, Dr. Barker again filled out Liberty's "Restrictions

Form." (LL-0152.) As with prior forms, he did not mark a level of physical activity that Ms.

Sanders was capable of. Nor did he note any particular restrictions that Ms. Sanders required,

instead simply listing Ms. Sanders's diagnoses and noting that she suffered from "visual changes,

double vision, numbness in extremities, confusion, headache, [and] fatigue." (*Id.*)

On January 21, 2010, Liberty wrote Ms. Sanders to tell her that it was denying her long-term

disability claim. (LL-0139–42.) Liberty stated that while it had received medical records from Dr.

Barker and Dr. Hollander, it had not received any records from Dr. Navarro, and the records that it

had received were not sufficient to show that Ms. Sanders had any disability. (LL-0141.) Several

days later, Dr. Navarro appears to have sent in her records (*see* LL-0132), and Liberty reopened the

claim. (*See* LL-0057.)

Liberty then commissioned a neurologist, Dr. Steven McIntire, to review Ms. Sanders's

medical records. (*See* LL-0129.) In late February, Dr. McIntire spoke with Dr. Barker about Ms.

Sanders, summarizing the conversation as follows:

> I contacted you regarding your patient, Amy Sanders, on 2/24/10. I
> asked your opinions regarding whether or not she had functional
> limitations and your opinions regarding her neurological status. You

8

mentioned that she has a lot of unusual symptoms.  You described her claiming to lose her balance when she was not in the front seat of a car or if she was in the back seat.  ***You indicated that overall, there was no neurological diagnosis that was disabling.***  You mentioned that she had agoraphobia.  In terms of her purported visual disturbances, you have not observed one of these or been able to elicit this in the office.  You mentioned that she apparently was being set up for vestibular rehab and had apparently undergone a workup for Meniere's disease.  You believe that there was a strong psychiatric component to her presentation.

(LL-0111 (emphasis added).)  Dr. Barker responded that this summary was accurate, and he commented that Ms. Sanders "also has cognitive disturbances of memory and personal interaction. Her memory issues are both short and long term."  (LL-0112.)

Dr. McIntire finished his report on Ms. Sanders on March 1.  (*See* LL-0118–21.)  Dr. McIntire concluded that "[f]rom a neurological perspective, there are not impairments, restrictions or limitations, with the exception of certain very specific environmental conditions."  Specifically, "it would be inappropriate for this claimant to be an operator of a large passenger vessel," and her "ability to drive her own car depends upon the laws of the state in which she resides and the advice of her treating physician and the extent to which her spells have been effectively treated.."  (LL-0120.)  Nor did Dr. McIntire find evidence of any "co-morbid diagnosis that would be impacting or resulting in impairment," or an "indication of any significant side effects" from her medicaitons. (LL-0120.)

On March 3, 2010, Liberty denied Ms. Sanders's claim.  (LL-0113–15.)  Its decision was based largely on Dr. McIntire's review, though Liberty also emphasized Dr. Barker's conclusion that "overall, there was no neurological diagnosis that was disabling."  (*Id.*)  "Based on the medical information in relation to your occupation requirements," Liberty stated, "you are able to perform the duties of your Own Occupation."  (LL-0114.)  It therefore denied her claim.

### D.      Appeal, Denial, and Lawsuit

Ms. Sanders appealed Liberty's decision.  (LL-0102–08.)  She objected that Liberty had not analyzed her old job, so it could not reasonably determine whether or not she could perform the duties of that job.  She further argued that her own doctors' opinions contradicted that of Dr. McIntire, who was not as well placed to evaluate her condition: "An arachnoid cyst is not a common diagnosis and perhaps a non-examining physician could not accurately assess its effects, resulting impairments, and Ms. Sanders' reported symptoms."  (LL-0104.)  Further, Dr. McIntire "is not familiar with the diagnostic process that Ms. Sanders has been through and may not be familiar with this type of rare condition."  (LL-0104.)  Ms. Sanders focused on the neurological and cognitive deficits caused by her health problems, emphasizing her need for unscheduled breaks, her confusion and difficulty expressing herself, and her ongoing need for medical treatment and therapy.  These problems are not consistent with a customer-service job like hers, she argued.  (LL-0105–07.)

On October 8, 2010, Liberty denied Ms. Sanders's claim a final time.  (LL-0091–98.)  "We have conducted a thorough review of [your] claim file and maintain that the review on appeal does not offer any findings that would alter the previous claim determination," Liberty stated.  (LL-0097.)

On September 1, 2011, Ms. Sanders filed suit in this court.  (ECF No. 1.)

## II.    STANDARD OF REVIEW

In deciding a claim under 29 U.S.C. § 1332(a)(1)(B), the courts review the plan administrator or fiduciary's decision to deny benefits under one of two standards.  *De novo* review is the default. It applies "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If the plan does grant sufficient discretionary authority, the

decision is reviewed under the more deferential "arbitrary and capricious" standard. *Yeager v. Reliance Std. Life Ins. Co.*, 88 F.3d 376 (6th Cir. 1996).

Cash Advance's Disability Policy expressly grants Liberty authority, "in its sole discretion, to construe the terms of [the] policy and to determine benefit eligibility," and it deems Liberty's decisions on these issues "conclusive and binding." (LL-0047.)  The parties agree that the authority granted by this clause would trigger *de novo* review.  They disagree about whether the clause is valid, however.

Specifically, Ms. Sanders argues that this provision is void under Michigan insurance regulations declaring that "discretionary clause[s] issued or delivered to any person in this state in a policy, contract, rider, indorsement, certificate, or similar contract document [are] void and of no effect."  Mich. Admin. Code R. 500.2202(c).  Liberty does not dispute that the provision in Cash Advance's Policy is a discretionary clause under the regulatory definition, *see id.* at 500.2201(c). But it does argue that the regulations do not apply here.  For one thing, it claims, the Policy was issued and delivered to Cash Advance's corporate headquarters in South Carolina, not in Michigan. For another, the Policy expressly states that it is "subject to the laws of" South Carolina, as its "Governing Jurisdiction." (LL-0001.)  South Carolina does not prohibit discretionary clauses, and so if that state's law applies to this contract, the provision is good and this court should review Liberty's decision under the arbitrary-and-capricious standard.

But the court need not reach this choice-of-law analysis.  Ms. Sanders does not actually argue that Cash Advance's Policy was "issued or delivered" to herself or any other person in Michigan, and the only evidence on record shows that it was not.  As Liberty states in an uncontradicted affidavit, the Policy had no specific connections to Michigan.  It was negotiated from

South Carolina, Tennessee, Massachusetts, and Georgia; signed by Cash Advance in South Carolina; and then issued and delivered to it in that same state. (*See* ECF No. 27.) The Sixth Circuit has held that the phrase "issued or delivered," as used in a related statute, does not apply simply because a beneficiary is located in Michigan. *See New England Mut. Life Ins. Co. v. Gray*, 786 F.2d 406, 407 (6th Cir. 1986). The same conclusion follows here, as another court in this district has persuasively explained. *See Foorman v. Liberty Life Assur. Co. of Boston*, No. 1:12-cv-927, 2013 WL 1874738, *2–3 (W.D. Mich. May 3, 2013).

Because Michigan's regulations do not void the Policy's discretionary clause, Liberty's decision must be reviewed under the "arbitrary and capricious" standard. This is a highly deferential standard of review, requiring that the decision "be upheld if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence." *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998) (quoting *Baker v. United Mine Workers of Am. Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991); internal quotation marks omitted). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Perry v. United Food & Commercial Workers Dist. Unions 405 & 442*, 64 F.3d 238, 241 (6th Cir. 1995) (quoting *Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989); internal quotation marks omitted).

## III. DISCUSSION

Ms. Sanders argues that she is unable to work for two main reasons. The first is that she cannot drive. As noted above, her former job requires a driver's license and access to a vehicle. If Ms. Sanders were in fact unable to drive, she would also be unable to perform the material and substantial duties of her former job. Unfortunately for Ms. Sanders, the record does not in fact show

12

that she was unable to drive at the relevant time. The only reference to driving in the record was from October 15, 2008, when Dr. Tanner recommended that Ms. Sanders not drive "because it is unclear whether or not she loses awareness during the seizures." (*See* LL-0307.) This recommendation lost any force it had when Dr. Tanner determined that Ms. Sanders did not suffer from epilepsy and did not lose awareness during her spells. At no other point in the record did any doctor even suggest that Ms. Sanders was restricted from ordinary driving.

Second, Ms. Sanders argues that her cognitive deficits—problems with memory, focus, and interacting with others—prevent her from working her old job. For the most part, it is Dr. Barker whose opinions support this argument. His Restrictions Forms consistently described Ms. Sanders as suffering from visual changes, double vision, confusion, memory loss, and fatigue. More on the nose was the form regarding Ms. Sanders's ability to do work-related mental activities, wherein Dr. Barker opined that of the 25 listed abilities, Ms. Sanders could perform none at an "Unlimited or Very Good" level, one of them at the "Limited but satisfactory" level, seven at the "Seriously limited, but not precluded" level, and the remaining 17 at "Unable to meet competitive standards." Specifically, Dr. Barker concluded that Ms. Sanders could not adequately "[m]ake simple work-related decisions," "[r]emember work-like procedures," and "[a]ccept instructions and respond appropriately to criticism from supervisors," among other things.

Yet nowhere did Dr. Barker explain just what he based these conclusions on. Simply noting, as Dr. Barker does, that Ms. Sanders had suffered a closed-head injury 25 years prior, that she was suffering from headaches and memory issues, and that she was emotionally labile, does nothing to support his opinions. Dr. Barker did not explain these deficits in any detail, and he did not refer Ms. Sanders to a psychiatrist to deal with this issues. Nor did he put her through testing to determine

13

the extent and nature of her cognitive deficits.  Indeed, no other doctor opined on these allegedly disabling deficits, contrary to what one would expect for a patient suffering from unexplained neurological problems.  The only other mention of cognitive deficits in the medical record is a passing mention by Dr. Navarro that since her head injury 25 years ago, Ms. Sanders has "had some speech disturbance or difficulty . . . mostly difficulty to get out words at times." (LL-0135.)  Finally, when asked about it by Dr. McIntire, Dr. Barker admitted that "overall, there was no neurological diagnosis that was disabling." (LL-0111–12.)

At best, Dr. Barker's opinions are ambiguous.  At worst, they are contradictory.  And in either case, they are not supported by any evidence in the record.  Ms. Sanders argues that her health problems are inherently subjective, and so Liberty erred by requiring evidence that simply cannot exist.  But this mistakes the disease for the symptoms.  Ms. Sanders's spells themselves may be subjective, but ultimately, Liberty accepted that they existed even though it had not seen any actual evidence.  What Liberty did not do, however, was accept Dr. Barker's claimed limitations solely on his say-so.  Each of those limitations was subject to at least some analysis.  At the very least, psychological tests could have measured some of Ms. Sanders's mental deficits, and evaluation by a trained psychiatrist or psychologist could have shined some light on the others.  But Dr. Barker did none of this.  Under these circumstances, it was entirely reasonable for Liberty to conclude, along with its neurologist, that there was no evidence of cognitive deficits in this record.

Ms. Sanders argues that Liberty erred by ignoring her treating physician's opinions.  This is incorrect.  Both Liberty and its reviewing doctors discussed Ms. Sanders's entire medical history at length, including Dr. Barker's records and conclusions. The fact that Liberty disagreed with Dr. Barker does not mean that it ignored him.  Plan administrators are not required "automatically to

14

accord special weight to the opinions of a claimant's physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  Liberty did not err by failing to defer to Dr. Barker's unsupported conclusions.

Ms. Sanders also emphasizes Dr. Hafeez's conclusion that her "[r]estrictions and limitations are supported by the medical evidence in the file." (LL-0402.)  But this too does not show that Liberty erred.  For one thing, Dr. Hafeez was evaluating Ms. Sanders's short-term disability claim, based on a different medical record than the long-term disability claim.  Though these two decisions are based on a common standard, they are still separate questions, and Liberty's grant of short-term benefits does not obligate it to grant long-term benefits as well.  For another, Dr. Hafeez himself admitted significant confusion about his opinion later on.  When asked to clarify his report, he acknowledged that he could not do so.  He expressly admitted that he was unable to describe Ms. Sanders's restrictions and limitations, even at a high level of detail: "For specific restrictions patient can be assessed by physical and rehabilitation medicine expert.  For cognitive impairments a neuropsychological evaluation can be performed. [T]he information provided to me is not enough to give any further clarifications on her physical or cognitive restrictions."  (LL-0404.)  This is hardly the description of a persuasive medical opinion.

Finally, Ms. Sanders also argues that Liberty resolved her claim under a conflict of interest, since it had to pay any claims it decided were meritorious.  Such a conflict of interest "must be weighed as a factor in determining whether there is an abuse of discretion." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)) (internal quotation marks omitted).  This factor is given more weight where the circumstances suggest that the conflict had a significant effect on the plan administrator's decision.

15

*See id.* at 117.  Ms. Sanders points to no such evidence, though.  Even considering the effect of this conflict of interest on Liberty's decision, the court sees no reason to find that decision arbitrary and capricious.

## IV.  CONCLUSION

For the reasons discussed above, the court finds that Liberty's decision to deny Ms. Sanders's long-term disability claim is supported by substantial evidence and was the result of a deliberate and principled reasoning process.  That decision was therefore not arbitrary and capricious, and the court will enter judgment in Liberty's favor.

## **ORDER**

For the reasons discussed herein, **IT IS ORDERED** that Plaintiff Amy Sanders's motion for entry of judgment (ECF No. 21) is **DENIED** and Defendant's motion for entry of judgment (ECF No. 25) is **GRANTED**.  Judgment shall issue consistent with this opinion and order.

**IT IS SO ORDERED.**


Date:   August 22, 2013                                     /s/ Paul L. Maloney
                                                            Paul L. Maloney
                                                            Chief United States District Judge

16